Good morning, may it please the court. Tim Wilborn, your talent, Katherine Dotson. This is a fairly straightforward case. It's a fibromyalgia, chronic pain, chronic fatigue case. The claimant alleges that she is in too much pain and in too much fatigue to sustain work activity on a full-time basis. The issue here is whether or not she is able to sustain work activity eight hours a day, five days a week in her past jobs, which were sedentary delight in nature, bookkeeping, office manager, that type of work. Her doctor in 1997 stated that she is limited to a four-hour workday if she could work at all. In 1999, the same doctor said that it wasn't clear or the doctor wasn't sure why the patient was fully disabled. When did she become eligible for ordinary garden variety Social Security? She had worked in covered employment before. She attained age 65 in the year 2000, September 16th of 2000. I do not know whether or not she took early retirement, but I have no evidence in my file that she did. Well, if she wasn't working, does she have to go through some formality about retirement? Yes. To take an early retirement, she has to go down and sign up for it. And if she did that, she would then receive a reduced benefit for the rest of her life. So even if she did retire early at the age of 62, this case would not be moved because it makes a very big difference to the claimant if we win this case, because we do win this case. What the administration does is go back and recalculate her benefit as though she had never retired early. And then instead of receiving the reduced benefit for the rest of her life, she would receive the benefit as though she had waited until full retirement age. So she's past that now. She is currently 67, almost 68. Anyhow, the main point, Your Honor, is that the doctor has stated when asked that the claimant is limited to part time work. If she is limited to part time work, she's disabled. Now, in rejecting that notion. I don't understand that. Are we talking about what period of time? The time she, from 62 to 65? Is that what I understood you were saying? Actually, her alleged onset date is April 1st of 96, at which time I believe she was 60 and a half. So that's the alleged period we're dealing with from age 60 and a half through age 65. Age is relevant because the Social Security guidelines have different measures of disability at different ages. Right. Exactly. How does that play out? Well, it plays out in that if if we can show that she can't do her past work. And one of the reasons that she can't do her past work is because she has concentration deficits. Right. If she could not have during the relevant time performed her past work, which we allege she could not have because of the limitations and concentration. These were jobs which required attentiveness, use of skills. What was the reason for not developing Dr. Anderson's potential testimony? If he had any, that would have helped her. Did the ALJ cut him off or something? Well, Dr. Anderson actually was not testifying live. It was submitted in on a deposition type thing. Well, more of just ladders. This is my life witness there. The ALJ did not have a live witness. Well, you know, the plaintiff has the burden of proof in these things. They don't want to bring in their evidence. They don't want to come up here and ask us to tell them to go out and come in again with more witnesses. Well, this is a issue that was addressed before the agency, your honor. When the ALJ rejected Dr. Andreessen's opinion on the basis that it didn't have any support behind it, which was pretty thin. Well, the ALJ said that it was. But this is a fibromyalgia case where you look at the. Well, he said she had subjective assessment. I'm assuming. Right. Pain. Well, let's say they always say that. So what happened here is Dr. Andreessen said, well, let's send her out for an objective assessment. We send her out for not we as in me, but she was sent out then for an objective assessment. She went through a physical capacities evaluation, which was submitted to the Appeals Council. And Dr. Andreessen did that and the ALJ did that. Who sent her out? Well, the claimant was sent out. The ALJ did not have anything to do with it at that point. Unless you said Dr. Andreessen sent her out. Well, Dr. Andreessen recommended that it be done. I'm not sure who actually went through the formality of sending her out. But the results of that physical capacities evaluation showed that, in fact, she was limited to the degree that Dr. Andreessen had had stated. And that is excerpts pages 96 and 97. And if you look at the combined capacity in an eight-hour day for sitting, standing and walking, it adds up from four to six hours total. Well, if you can sit, stand, walk for only four to six hours total, you can't perform full-time work. And I would like to reserve some for rebuttal. But one last point is that the ALJ engaged in some mathematics here. He added up the activities the claimant could do. And it's our position that that mathematical task that the ALJ went through is contrary to this court's previous decisions in Fair, Vertigan and that line of cases, which says that the ability to engage in those sporadic activities is not contradictory to an assertion of disability. And most of the activities that the ALJ added up are those kinds of things like self-care. And if the claimant is able to perform these activities for a total of six hours a day, as the ALJ alleges, she still couldn't perform full-time work because it's six, not eight. And furthermore, it's not even six because things like getting up, taking a shower, getting dressed, eating breakfast, which the ALJ counted in his mathematical formulation. Those things don't count toward your work capacity because you have to do that even if you're working. I'd like to reserve the rest. Thank you. Good morning. May it please the court. David Bloom for the commissioner. I wanted to respond to some of the points that plaintiff counsel has raised. First of all, although the evidence does support the ALJ's finding that Ms. Dotson could perform full-time work, it's untrue that you have to find that she was able to do full-time work to find her not disabled because at step four, you can do part-time work and still qualify to do your past relevant work. It's only at step five when we're looking to see if you can do other work that you have to be able to work 40 hours a week. So given that if you were working part-time, it's sufficient to be able to work part-time. What if you were working full-time? The past relevant work regulation says that all they have to find is that you're able to do the kind of work you did in the past. And this Court's decisions in Byington, Keyes and Katz specifically found that past relevant work can be part-time work. So even if someone were doing – if someone could do the same kind of work that they were doing before, if they could do it part-time, that still qualifies as part-time. Are you sure about that? It doesn't sound right to me. I thought it was always understood that you had to be able to work full-time, but the kind of work that would count as past work would be the kind of work you did. It could be the kind of work you did part-time, but you have to be able to do it full-time, no? How much you have to work to be disabled changes depending on what you did in the past? There is a difference between Step 4 and Step 5. In Step 4, you can find that someone is only able to work part-time as long as it qualifies as substantial gainful activity. At Step 5, the agency imposes the rule on itself that you have to be able to work 40 hours a week. And the cases, again, are Byington, Keyes and Katz. They're Ninth Circuit cases. They do state that you can work part-time as past relevant work. Now, in this case, one of her previous jobs was part-time work. In fact, the last job that she had is a hospital admissions clerk. For some strange reason, the ALJ did not find that that was one of the jobs that she could perform. The ALJ found that she could do sedentary or light work as an office manager or apartment manager, and he omitted that previous work as a hospital admissions clerk. This Court, though, has the authority to modify the decision as need be under Blacknall or Section 405G to include a lesser, narrower finding. And because the part-time job was lesser and narrower than the full-time jobs the ALJ found, that would be appropriate as well. Now, as far as Dr. Anderson's opinion, her opinions were contradictory. She first said in 1997 that cleanup was limited to four hours a day, but then she backed off that. In 1999, I believe, she said that she was not fully clear why Ms. Dawson was disabled. That was after she had gone back to see her specialist, the rheumatologist, Dr. Wassner, whose findings were normal, and the treating doctor noticed that and backed off her previous job. The findings were normal for Dr. Wassner? Yes. She had a finding that was normal. Yes, but Dr. Wassner was, for one thing, he was unwilling to give a disability opinion, and he noted in 1999 that she had osteoarthritis with fibromyalgia, but that she had good range of motion and that the fibromyalgia was improving. That's not normal. Well, I mean, the question, yes, she still had it, and the ALJ found it was a severe impairment. That's a pretty issue we've discovered over the years of the past, is that fibromyalgia is a very serious and painful disease. We're not downplaying it. I mean, the ALJ did find that it was a severe impairment. The question is whether it disabled her fully. Dr. Wassner had seen her in 1993 before this claim ever came up. Now, was he ever her treating physician between 1993 and, say, 1999, or did he just come into the case to take a look in 1999? He came back to take a look. One of the reasons that he declined initially to give an opinion on her disability was that he stated he hadn't seen her in many years. So the second time that he re-evaluated her was in that March 1999 opinion. He didn't cross-refer back to his chart and stuff to see what her change was since he had been seeing her in 1993? I don't know if he – I can't recall whether he reviewed the medical records. He re-examined her in March 1999. So he did an evaluation and then gave an opinion. But he wouldn't make a comment on disability. Correct. I think one of the telling medical records here – I mean, Dr. Anderson's one-time opinion stating that she was limited to four hours of work is really an anomaly in the medical records. If you look at Dr. Anderson's own treatment notes, as the ALJ pointed to, one of the most telling ones I saw was in July 1997. It's at page 40 of the excerpts of record. It's only two months before she gave the opinion that Ms. Dawson was limited to four hours a day of work. And in that report, again July 1997, the treating doctor stated that Ms. Dawson got better when she did aerobics, but that she did that infrequently. She stated that she was enjoying life and was looking forward to taking more trips with her husband. This is not the kind of report that lends itself to two months later stating that this person is limited to four hours of work a day. They don't match. And in the other – Or it could be that she had a positive attitude, that she was trying to continue to live her life. I think in terms of her husband, it's a lot different than full-time employment. Well, then look at the other medical reports from Dr. Anderson as well. If you look in 1996, these are pages 40 through 47 of the excerpts of record. And then again in 1998, the main complaints from Ms. Dawson at that time were things like rash, sleep disturbance. And in 1998, occasional fibromyalgia pain, again a rash complaint. Even when she's seeing Dr. Anderson, she's not complaining primarily about fibromyalgia. So to state that for some reason she's limited to four hours a day, I mean, it's one interpretation of the record to state that that's reasonable. But the ALJ's interpretation was reasonable as well. And if the evidence can support more than one rational interpretation, the ALJ's must stand. And regarding the activities of daily living that plaintiff counsel spoke about, Vertigin did talk about occasional activities not indicating necessarily an ability to perform work. But the activities that plaintiff performed here were not sporadic as plaintiff counsel characterized them. She indicated that she did activities such as cooking, cleaning, housework, attending church more than once a week, actually being a Sunday school teacher, playing the piano or organ in church, and that they added up to about six hours a day. Now, that's a substantial part of the day. And the actual test that I mentioned in Vertigin and Fair and some of the other cases is that if someone is able to do activities a substantial part of the day that might translate into work, then it's a reasonable assumption on part of the ALJ to use those in a credibility finding. And those activities, housework and attending church, playing the piano there, they're at least compatible with the light or sedentary type of jobs that the ALJ found Ms. Dawson could perform. And my notes show not only the fibromyalgia, but also degenerative disc disease, difficulty in concentrating and depression. Are those taken into consideration? Yes, because the ALJ found those non-severe. In combination, they're not severe? Yeah, I mean, that's a difficult question, because by the definition of severe is that they have an insignificant impact on someone's functional abilities or abilities to work. Just how many of those or how they combine and what kind of effect they have is hard to say. But according to Dr. Johnson, the state agency reviewing doctor, who looked at the objective test results and plaintiff's daily activities, she concluded in April of 1998 that plaintiff retained the capacity to perform night duty work. And the psychiatrist, Dr. Wimmers, who looked at the evidence as well for the state agency, determined that plaintiff's mental impairment was not severe. There is a 1997 report from Dr. Johnson that says she can work for two to four hours at a time and then she's to rest for three to four hours. What happened to that? Yeah, that's actually a different Dr. Johnson. That's an examining, that's Leah Johnson. Right. And I noticed that too, but if you look at the beginning of the report and at the end, Dr. Johnson is merely echoing plaintiff's self-reports. It's almost word for word. Plaintiff reports that she can only work for a few hours and then needs three to four hours of rest, and then Dr. Johnson echoes that at the end in his assessment, in her assessment. I see that my time's up, unless I have any further questions. Thank you very much. Thank you. Let's first follow up on. I have a question. Is Dr. – is Mr. Bloom correct that at the fourth stage part-time work is sufficient? That was my first point. Appellant's reply brief, page 11. In Social Security ruling 96-8P, it is very clear that a finding that you can go back to part-time work at step four of the sequential analysis may be made only if you have performed that same job on a part-time basis in the past. Now, if she performed hospital admissions clerk on a part-time basis six hours a day, that's not one of the jobs the ALJ found she could return to. So this court can't find that she can return to it either. Opposing counsel has suggested that this court should violate the Supreme Court longstanding ruling in SEC v. Chenery and just make up some things that the ALJ didn't put in his own decision. I don't agree with his assertion on that point. With regard to these activities of daily living, I think it's critical to look not only at the part of Vertigo that was cited by Mr. Bloom, but also to to read this line here, which appears on page 28 of our opening brief. It says, in addition, activities such as walking in the mall, swimming, are not necessarily transferable to the work setting with regard to the impact of pain. And so what you have to look at is not only can she do activities, but whether those activities are ones that she could transfer to the work setting. Plus, as I understand her explanation, it's that she needs to lie down for several hours after she does things. So even if she can do them, she can't. Right. That's a point we made, actually. In the course of an eight hour day at work, you're actually working for eight hours, except for during your breaks. But in the course of a person's life, say you get up at seven o'clock in the morning, you have about a 16 hour span in which to accomplish those six hours of activity that she has admitted she accomplishes. So it's not the same. She could work, you know, like get up and get dressed, fix coffee, breakfast, do whatever she does in the morning. Say that took two hours and then she had to rest for three hours. Then if she could be active for another couple hours midday and then rest for another three hours and be active for another couple hours in the evening, that's fully consistent with her allegations that she is incapable of sustaining full time activity. Okay, your time is up. Thank you very much.
judges: Goodwin, Hug, Berzon